```
         IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF OHIO
                    EASTERN DIVISION
```

Melissa E. Davis,                  :

    Plaintiff,                :

  v.                               :Case No. 2:16-cv-312

                                           :CHIEF JUDGE EDMUND A. SARGUS, JR.
Commissioner of Social              Magistrate Judge Kemp
Security,                          :

    Defendant.                :

## REPORT AND RECOMMENDATION

### I. Introduction

Plaintiff, Melissa E. Davis, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits.  That application was filed on September 27, 2011, and alleged that Plaintiff became disabled on June 10, 2011.

After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge on September 17, 2014.  In a decision dated October 21, 2014, the ALJ denied benefits.  That became the Commissioner's final decision on February 17, 2016, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on June 24, 2016.  Plaintiff filed a statement of errors on August 11, 2016, to which the Commissioner responded on November 23, 2016.  Plaintiff did not file a reply brief, and the case is now ready to decide.

### II. Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 44 years old as of the date of the hearing and who has a high school education with some college work, testified as follows.  Her testimony appears at pages 44-83

of the administrative record.

Plaintiff testified that she was a licensed cosmetologist. Other than selling some 31 brand gift products in 2012 and 2013, she had not worked since her alleged onset date. Before that, she had worked for 23 years as a cosmetologist and as a nail technician. She owned her own shop for six of those years. That work required standing, bending, and twisting (or, for doing nails, sitting and bending) and did not involve lifting objects heavier than a blow dryer.

Plaintiff said she had suffered from scoliosis since she was young. More recently, she had developed issues with her neck as well. She had not undergone back or neck surgery. She did have carpal tunnel release surgery on her left wrist in 2012. Additionally, she was being given shots in her foot every three weeks to treat Morton's neuroma. Without those shots, she could not walk at all. She wore a prescription boot on her right foot and had been using a TENS unit for several years to help loosen up her back.

When asked about medications, Plaintiff testified that she took them for fibromyalgia, a thyroid condition, anxiety, and back pain. She was getting treatment from her family physician, a rheumatologist, and a licensed social worker. Her worst pain was in her back and hip although she also had pain in her shoulder, arm, and neck, which could radiate into her back. Plaintiff said she could walk for about ten minutes on level ground, stand for about the same amount of time, and bend and squat, but not very well. She could sit in one position for ten or fifteen minutes but was never really comfortable. Also, if she sat for too long, her legs went numb.

Plaintiff said that she needed help with personal care. She could not raise her arms high enough to wash her hair. Her husband and mother (and sometimes a friend) helped get her

children ready for school in the morning.  She was seldom able to help with cooking or laundry, and did not often accompany her husband or her mother when they shopped for groceries.  There were times when she had to leave social gatherings due to pain.  She applied ice to her foot at least once per day and often rested or elevated it as well.  She also said she dropped objects in the home like a coffee cup or her glasses and that she could not use either hand repetitively.

### III.  The Medical Records

The pertinent medical records are found beginning at page 379 of the administrative record.  They can be summarized as follows.

#### A.  Physical Impairments

X-rays were taken of Plaintiff's lower back and right hip on March 2, 2009.  They showed levoscoliosis of the spine and mild degenerative changes at L3-S1, but no abnormalities in the right hip.  An MRI done at about the same time showed a herniated disc at L4-5.  (Tr. 379-80).  Later in the year, Plaintiff elected to have steroid injections, which were performed on November 30, 2009 and December 14, 2009.  She also had physical therapy, which, at the time, appeared to have been effective in reducing her pain, although she reported later that it was not.  She also had more injections in 2010 and said they had a temporary effect on her pain.  (Tr. 381-98).  The physician who treated her Morton's neuroma, Dr. Wayt, commented in November, 2011 that he thought she could still work and that she had no limitations due to her foot problems.  (Tr. 424-26).  He repeated his belief that she was not disabled in a note dated August 26, 2012.  (Tr. 546).

Also in 2011, Plaintiff underwent an MRI of her thoracic spine.  That study showed bulging discs at various levels as well as two disc herniations, but without spinal stenosis or cord signal abnormality.  (Tr. 435).  An MRI of the cervical spine

showed some disc bulging as well with some loss of disc spacing and some spinal stenosis.  (Tr. 440).  Finally, an MRI of the lumbar spine showed that there was degenerative disc disease at L4-5 with a broad-based disc protrusion which could compromise the left L5 nerve roots.  However, the study was also interpreted as showing no changes since April of 2009.  (Tr. 441-42).  She also had carpal tunnel release surgery in 2011.  (Tr. 464).  Dr. Wayt's treatment notes from 2012 showed a diagnosis of fibromyalgia as well as chronic back pain and depression, and also indicated that Cymbalta had helped her pain.  She later developed numbness and shoulder pain on the right side with associated decrease in range of motion.  (Tr. 534-42).  Her shoulder was subsequently injected but that did not have much effect.  (Tr. 569).  An MRI of the shoulder showed some degenerative changes in the AC joint.  (Tr. 578).  In 2013, she informed Dr. Wayt that she no longer needed pain medication for her back and had not been taking it in quite some time.  (Tr. 575).  She continued to report numbness in her right hand and arm in 2014, however, as well as generalized fatigue.

   Dr. Musunuri saw Plaintiff on April 25, 2012, for a consultative physical evaluation.  Plaintiff reported a three or four-year history of back pain which was being treated by physical therapy and a TENS unit.  She more recently began to experience pain in her right thigh and ascribed this to fibromyalgia.  She needed to have carpal tunnel surgery on her right hand and she was depressed.  Manual muscle testing was normal and he observed no limits on her range of motion.  He also said she could walk and grip without difficulty.  Dr. Musunuri concluded that any work-related limitations were moderate.  He reported her statements about the ability to sit, stand, and walk, but made no independent assessment of those abilities.  (Tr. 523-32).

Plaintiff began seeing Dr. Vawter regularly in 2013 (she had seen him once in 2012). She told him in May that she was having discomfort in her back and neck and had not been taking Lyrica, which he had prescribed, because she could not afford it. He found tender points in her cervical, thoracic, and lumbar areas. In October, 2013, she reported some relief with Gabapentin. She showed only minimal tenderness over the major muscle groups and Dr. Vawter described her as being in "minor discomfort." (Tr. 579-82). On July 22, 2014, he completed a functional capacity evaluation form, indicating that Plaintiff had fibromyalgia syndrome, osteoarthritis, degenerative arthritis, and cervical spinal stenosis. He said her condition was severe and that she could not sit, stand, or walk for more than two hours each during a work day. She would also have to lie down, could not lift any amount of weight, and would miss work at least three days per month and "probably more." (Tr. 617-23).

B. Mental Impairments

David R. Bousquet, M.Ed., performed a consultative psychological evaluation on February 9, 2012. At that time, Plaintiff had been in mental health counseling for a few months and was taking psychotropic medication prescribed by her family doctor. She reported depression and tearfulness due to pain and not being able to do things she used to do. She described problems with energy level and motivation but also said she became anxious if she had to do anything or go anywhere. Plaintiff read during the day but had a hard time finishing things, and she watched television and cared for a young child. Mr. Bousquet observed that Plaintiff's mood was anxious and sad. He thought her intellectual capacities were in the average range. He diagnosed a mood disorder due to multiple medical problems and rated her functional GAF at 60. He concluded that she could remember and carry out job instructions, would have difficulty

maintaining attention and concentration or persistence and pace in a job setting, would not have problems maintaining socially acceptable behavior in the workplace, and would have some problems responding to work stress. (Tr. 502-09).

    A mental health assessment was also done by a therapist, Carole Ann Al-Din, whose notes show that Plaintiff reported being unable to work due to pain caused by fibromyalgia and that she had some problems with anxiety. Ms. Al-Din diagnosed a major depressive disorder and an anxiety disorder in addition to a mood disorder, and she rated Plaintiff's GAF at 48-50. Two subsequent progress notes showed that Plaintiff said she was unable to go back to hair styling because she could not hold her back, neck, and hands up for any length of time, and that strength and stretching exercises were helping to reduce her pain. (Tr. 513-17). Counseling notes from later in 2012 indicate that in April, Plaintiff was doing much better, although she also was experiencing an increase in anxiety which led to an emergency visit in May. In June, she appeared subdued and tired, which could have been due to caffeine withdrawal. By August, she described her life as a "complete mess." (Tr. 547-56). In 2013, notes show that she had been absent from counseling for three or four months. She said in January that she had been walking, and in April reported doing some work from home. By May, her affect was broader, and in July and September her mood was euthymic and she seemed to be progressing. She did have one session, however, where she had to lie on the floor due to low back pain. (Tr. 591-603). Ms. Al-Din subsequently completed a questionnaire stating that Plaintiff had problems with attention and anxiety and that she would not likely be able to go back to work due to those problems and chronic pain. She also endorsed several marked limitations in work-related functioning. (Tr. 604-06).

                              C.   <u>State Agency Reviewers</u>

Plaintiff's impairments were also evaluated by state agency physicians and psychologists. From a physical standpoint, Dr. Hall concluded that Plaintiff could do a limited range of light work with some postural restrictions and a limitation on the use of her right arm and hand. (Tr. 123-25). Dr. Chang later agreed with that assessment. (Tr. 140-41). Neither had the benefit of Dr. Vawter's opinion.

As to psychologically-based limitations, Dr. Haskins said that Plaintiff was moderately limited in her ability to maintain concentration and attention for extended periods but she could complete tasks in a static work setting that did not require close sustained focus or sustained fast pace or have stringent time or production requirements. (Tr. 125-27). Those conclusions were reaffirmed by Dr. Rabold. (Tr. 142-43). Both of those opinions were rendered in 2012.

### IV. The Vocational Evidence

Larry Bell testified as the vocational expert in this case. His testimony begins at page 84 of the administrative record.

First, Mr. Bell was asked to classify Plaintiff's past relevant work. He said that the job of hair stylist was light and skilled, and that was true even for someone who owned her own shop. The nail tech job was the same.

Next, Mr. Bell was asked questions about a hypothetical person of Plaintiff's age, education, and work experience who could perform at the light exertional level but who could not climb ladders, ropes, or scaffolds and could occasionally stoop or crawl. In addition, the person was limited to frequent handling and fingering with the right upper extremity. Mr. Bell said that such a person could work as a hair stylist. Limiting the person to sedentary work would eliminate that job, but the person could still work as a bench worker or a general sorter.

Mr. Bell was then asked if there would be jobs available to

Plaintiff if she were as limited as she described in her testimony, including the fact that she would be off task for 30% of the day and would average four absences from work each month. He said such a person could not do routine work at any exertional level. The limitations contained in the reports from Dr. Vawter and from Plaintiff's social worker, Carol Al-Din, also were work-preclusive.

Finally, in response to questions from Plaintiff's counsel, Mr. Bell testified that someone who could use the upper extremities on only an occasional basis could not work as a hair stylist or do any of the other jobs he identified. Also, keeping one foot elevated for an hour per day would eliminate even sedentary work.

### V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 13-26 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015. Second, he found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. Going to the next step of the sequential evaluation process, the ALJ concluded that Plaintiff had severe impairments including mild to moderate degenerative disc disease of the cervical spine from C4-C6; disc herniations at T7-T8 and T-10-T11 without significant spinal stenosis or cord signal abnormality; degenerative disc disease at L4-L5; diagnosis of osteoarthritis of multiple sites/fibromyalgia; Morton's neuroma of the right foot; and bilateral carpal tunnel syndrome status post left-sided release in December 2011. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404,

Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff could work at the sedentary exertional level, could occasionally stoop and crawl, and could not climb ladders, ropes, or scaffolds.  Also, she was limited to frequent fingering and handling with the right upper extremity.

With these restrictions, the ALJ concluded that Plaintiff, could not do her past relevant work, but she could work as a bench worker or a general sorter.  He also found that those jobs existed in significant numbers in the regional economy (1,650 positions) and the national economy (174,500 positions).  Consequently, the ALJ decided that Plaintiff was not entitled to benefits.

## VI.  Plaintiff's Statement of Errors

In her statement of errors, Plaintiff raises these issues: (1) the ALJ failed to give controlling weight to the treating source opinions; (2) the ALJ did not take Plaintiff's fibromyalgia into account in making his residual functional capacity finding; (3) The ALJ did not weigh adequately the non-medical source evidence; and (4) the ALJ's credibility finding was not supported by the record.  These issues are considered under the following legal standard.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435

(6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. The Treating Source Opinion

Plaintiff argues, first, that the ALJ should have given controlling weight to the opinion expressed by Dr. Vawter. She asserts that his opinion was well-supported and should have been given either controlling weight or substantial deference. Instead, the ALJ afforded it no weight at all. Plaintiff asserts the reasons given by the ALJ do not support that evaluation.

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. 20 C.F.R. §404.1527(c); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations

performed by non-treating medical sources, and may consider the claimant's activities of daily living. Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994). No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision. Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

As always, it is helpful to begin the analysis of this issue by examining the ALJ's decision in some detail. Before directly discussing Dr. Vawter's opinion, the ALJ reviewed his treatment records, noting that the physical examinations he performed showed very little tenderness and that he diagnosed osteoarthritis without the benefit of any objective evidence to confirm that diagnosis. (Tr. 21). Then, after giving only little weight to the opinions of the state agency reviewers (both of whom said that Plaintiff could do light work) because they were rendered prior to additional medical records becoming available, based on Plaintiff's testimony, and in order to give Plaintiff the benefit of the doubt, the ALJ turned to the form completed by Dr. Vawter.

The ALJ supplied six different reasons for giving the opinions expressed on that form no weight. They are: (1) the form is a checklist and provided no objectively-based explanation for the limitations expressed on it; (2) Dr. Vawter did not confirm the presence of osteoarthritis by any objective testing; (3) Dr. Vawter's treatment notes, indicating that Plaintiff's condition was stable, are inconsistent with this evaluation; (4) the opinion conflicts with the notes of "the claimant's primary care provider" (presumably Dr. Wayt) whose notes "reveal normal objective findings from a musculoskeletal and neurological

standpoint" and who did not believe that Plaintiff was disabled; (5) Plaintiff's activities of daily living are in excess of the capabilities stated on the form; and (6) the assertion that Plaintiff would miss more than three days of work per month is "based upon pure speculation and conjecture." (Tr. 22-23).

   Plaintiff takes issue with this line of reasoning, contending that Dr. Vawter did support his opinions with citations to the records; that his own treatment notes say not only that Plaintiff's condition was stable, but that she was experiencing pain, discomfort, depression, and anxiety; that his status as a specialist distinguishes his opinion from that of Dr. Wayt, who is not; that Plaintiff's daily activities are not necessarily consistent with working full-time; and that the ALJ did not factor in the length and nature of the treating relationship. In response, the Commissioner asserts that the ALJ articulated sufficiently good reasons to justify his decision to discount Dr. Vawter's opinion.

   Here, the ALJ crafted a residual functional capacity finding which fell somewhere in between that expressed in the opinions of the state agency reviewers and that expressed by Dr. Vawter. To that extent, even though the ALJ said that he gave no weight to Dr. Vawter's opinion, he still credited some of Dr. Vawter's medical findings in deciding that Plaintiff was limited to a range of sedentary work. Further, although the ALJ may not have been entirely accurate when he said that Dr. Vawter cited no findings in support of his opinion, he correctly noted that there was no objective evidence of osteoarthritis of multiple joints, which diagnosis appeared to play a large part in Dr. Vawter's opinion. Further, the examination notes of both Dr. Vawter and Dr. Wayt show that Plaintiff's condition was basically normal, with normal muscle strength and range of motion. Dr. Wayt did, as the ALJ noted, express his opinion on several occasions that Plaintiff was not disabled, and the ALJ is also correct that

Plaintiff's own description of her activities of daily living, while not necessarily supporting a finding that she could work on a full-time basis, show that she was capable of a greater range of activities than Dr. Vawter's opinion indicated. These factors, taken together, indicate that reasonable minds could differ about how much weight should be given to Dr. Vawter's opinion, which, while it may have some support in the record, cannot be said to be consistent with the entire record - which is the other part of the legal standard which governs when a treating source opinion is to be given controlling weight. See 20 C.F.R. §404.1527(c). The ALJ acted within his "zone of choice" on this issue given the conflicting evidence, and that precludes a reviewing court from reversing the ALJ's finding. See, e.g., Buxton v. Halter, 246 F.3d 762, 773 (6th Cir. 2001)("there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference").

### B. Fibromyalgia

Plaintiff's second argument is that the ALJ erred by not adequately incorporating limitations arising from her fibromyalgia into the physical residual functional capacity finding. She concedes that the ALJ cited the appropriate Social Security Ruling (SSR 12-2p) used in evaluating fibromyalgia, but contends that some of the criteria in this Ruling are outdated, and argues that the severity of this impairment should have been determined using the more recent criteria developed by the American College of Rheumatology.

It appears that Plaintiff is arguing that the ALJ made an error of law when applying SSR 12-2p. That Ruling states that the ALJ "will find" that a person has fibromyalgia if (1) there is a diagnosis of that condition by a qualified physician - which there was here; (2) the diagnosis is not inconsistent with other evidence in the record; and (3) the claimant satisfies the requirements set out either in the American College of

-13-

Rheumatology's 1990 Criteria for the Classification of Fibromyalgia (which are reiterated in Section II(A) of the Ruling) or the 2010 Preliminary Diagnostic Criteria, which are incorporated into Section II(B) of the Ruling.

Here, the ALJ did find, at step two of the sequential evaluation process, that Plaintiff's "osteoarthritis of multiple sites/fibromyalgia" was a severe impairment (Tr. 15), which is the issue specifically addressed by SSR 12-2p, but, somewhat inconsistently, also concluded that "the objective requirements needed to establish this impairment are not contained in the evidence." (Tr. 24). The ALJ then cited to both sets of criteria found in SSR 12-2p, concluded that those requirements were not met, and then said that, despite this finding, "the claimant's pain symptoms stemming from her fibromyalgia, musculoskeletal, and/or neurological issues have been taken into account when determining [her] residual functional capacity ...." Id.

It is not clear exactly what issue Plaintiff has raised here. The ALJ did, contrary to Plaintiff's argument, cite and discuss not only the earlier criteria from the American College of Rheumatology but the later ones as well. She may be arguing that despite using the correct criteria, the ALJ erred by not finding fibromyalgia to be a severe impairment here. If that is her argument, any such error in this case was harmless. The failure of an ALJ to find that any particular impairment is severe can be cured by taking any limitations caused by that impairment into account when a residual functional capacity finding is made. As this Court said in Angelo v. Comm'r of Social Security, 2013 WL 765646, *6 (S.D. Ohio Feb. 28, 2013), adopted and affirmed 2013 WL 1344841 (S.D. Ohio Apr. 2, 2013), if "the ALJ considered all of plaintiff's impairments (both severe and non-severe) in determining plaintiff's RFC, any alleged failure to characterize certain impairments as 'severe' at step

-14-

two of the sequential evaluation is legally irrelevant and constitutes harmless error." See also Maziarz v. Secretary of Health & Human Services, 837 F.2d 240, 244 (6th Cir. 1987).  The ALJ did so here, and this Court has already determined that his evaluation of the opinions rendered by Dr. Vawter, who treated Plaintiff for fibromyalgia, was not erroneous.  Consequently, there is no merit in Plaintiff's second claim of error.

### C.  The Non-Medical Source Evidence

The third error which Plaintiff alleges relates to the ALJ's evaluation of evidence from nine different lay witnesses, all of whom commented on how Plaintiff's physical pain affected her day-to-day activities.  The ALJ cited to SSR 06-03p in evaluating this evidence and said that he considered it, but determined that more weight should be given to the medical evidence and credible opinion evidence which, in his view, tended to "discredit the severity of the limitations as set forth in the narratives submitted by the claimant's friends and family." (Tr. 23).  He also commented that the narratives were "not all that applicable to how [Plaintiff] would function in a work environment."  Id. Plaintiff faults this analysis as deviating from the standards set forth in both SSR 06-03p and SSR 16-3p and as failing to provide any real explanation about why so little weight was assigned to this evidence.  The Commissioner argues, in response, that Plaintiff is simply attempting to get this Court to reweigh the evidence, and that such reweighing is clearly beyond the scope of permissible judicial review.

SSR 16-3p, one of the two Rulings cited by Plaintiff, was not in effect at the time the ALJ made his decision, so it is difficult to see how any alleged failure to follow that Ruling could be error.  That Ruling was intended to clarify Ruling 96-7p, however, which was in effect when the ALJ decided this case, and which also authorized an ALJ to consider "other relevant evidence" including statements from non-medical sources in

determining the extent to which a claimant suffered from debilitating symptoms caused by medically determinable impairments.  SSR 06-03p, which the ALJ did cite, says that an ALJ can consider evidence from "other sources" including "[s]pouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers" in determining the severity of any impairment.  The Ruling does not mandate any particular procedure, but states that "it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence."

The ALJ complied with SSR 06-03p by acknowledging the "other evidence" presented, citing the relevant factors from the Ruling, and explaining that he was giving more weight to the medical opinion evidence.  No further explanation of his reasoning process was required. See, e.g., Kelly v. Comm'r of Social Security, 2016 WL 8115402, *10 (E.D. Mich. July 22, 2016), adopted and affirmed 2016 WL 4868532, (E.D. Mich. Sept. 15, 2016)(holding that although an ALJ must consider statements like these, they are not statements "to which the ALJ was required to explicitly assign weight").  The Commissioner is correct that if the Court were to go beyond determining whether the ALJ complied with the applicable regulations by considering this evidence, and would second-guess the weight assigned to it, the Court would be usurping the function of the Commissioner in weighing the evidence.  Consequently, the Court finds no merit in this third claim of error.

### D. The Credibility Finding

Lastly, Plaintiff contends that the ALJ erred when he did not find her testimony of disabling symptoms to be fully credible.  In support of this assertion, she argues - again citing to SSR 16-3p - that the reasons given for discounting her

-16-

testimony, including the fact that she supposedly engages in a "wide array" of activities of daily living - are insufficient and represented an impermissibly selective reading of the record.

It is also the law that a social security ALJ is not permitted to reject allegations of disabling symptoms, including pain, solely because objective medical evidence is lacking. Rather, the ALJ must consider other evidence, including the claimant's daily activities, the duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, medication (including side effects), treatment or therapy, and any other pertinent factors. 20 C.F.R. §404.1529(c)(3). Although the ALJ is given wide latitude to make determinations about a claimant's credibility, the ALJ is still required to provide an explanation of the reasons why a claimant is not considered to be entirely credible, and the Court may overturn the ALJ's credibility determination if the reasons given do not have substantial support in the record. See, e.g. Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994).

Here, the ALJ provided not just one, but multiple, reasons for discounting Plaintiff's testimony. They included "the degree of medical treatment required, discrepancies between the claimant's assertions and information contained in the documentary reports, the medical history, the findings made on examination, the claimant's assertions concerning her ability to work, and the reports of the reviewing, treating, and examining physicians." (Tr. 23). Her ability to perform a "wide array of activities of daily living" was only one factor in this analysis, see id. The ALJ was also entitled to, and did, consider the objective medical evidence showing relatively mild disease of the spine without significant spinal or foraminal stenosis and the lack of clinical evidence of advanced arthritis or soft tissue injury. (Tr. 23-24). Nevertheless, the ALJ did credit her testimony to the extent that he limited her to sedentary work

activity.  The Court concludes that the credibility analysis was sufficient and supported by evidence in the record and that, again, the ALJ made a decision which was within his "zone of choice."  That being so, the credibility finding presents no basis for reversal or remand.

### VII. Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the Commissioner.

### VIII. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge